IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JOHN ROBERT BEGLEY and CARRIE BELL BEGLEY, on behalf of themselves and all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | CASE NO. 3:16cv149-MCR/CJK |
| v. | : : | |
| OCWEN LOAN SERVICING, LLC, | : : : | |
| Defendant. | : | |

PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF
<u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>

Pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (e), Plaintiffs John Robert Begley and Carrie Bell Begley (the "Begleys") respectfully move the Court to enter an order: (1) preliminarily certifying a proposed nationwide Settlement Class for settlement purposes only, and appointing the Begleys as the representatives of the Settlement Class and the undersigned as counsel for the Settlement Class; (2) preliminarily approving the Parties' proposed Stipulation of Settlement and Release, including all exhibits thereto (collectively, the "Settlement"); (3) approving the notice plan and forms of notice to the Settlement Class proposed by the Settlement; (4) appointing Class-settlement.com as the Settlement Administrator; (5) setting dates and procedures for opt-outs, objections,

and a final fairness hearing under Federal Rule of Civil Procedure 23(c)(2); and (6) issuing a preliminary injunction for purposes of protecting the Court's jurisdiction while the Court considers whether the settlement should be finally approved.

This motion is based on the following Memorandum of Points and Authorities, the accompanying declaration of Attorneys' Bryan Aylstock, Joseph "Jay" H. Aughtman, Kenneth J. Grunfeld and Aaron Hemmings and the exhibits attached thereto ("Class Counsel Decl."), the other pleadings on file in this matter, any other materials or testimony that may be submitted at the hearing, and any further argument that the Court might allow.  The Parties' proposed Settlement is attached as Exhibit 1 to the Class Counsel Declaration, and a proposed preliminary approval order for the Court's consideration is attached as Exhibit E to the Settlement itself.

Prior to the filing of this motion, the undersigned conferred with Ocwen's counsel pursuant to Local Rule 7.1(B) regarding this motion and the relief it seeks, and Ocwen's counsel stated their non-opposition to this motion for purposes of settlement only.

The Begleys request oral argument on this motion, should the Court desire it, pursuant to Local Rule 7.1(D).  It is estimated that oral argument will require no more than one hour.

# **TABLE OF CONTENTS**

## MEMORANDUM OF POINTS AND AUTHORITIES

The Begleys respectfully seek certification of the proposed Settlement Class for purposes of settlement, and request that the Court grant preliminary approval of the Parties' Settlement (attached as Exhibit 1 to the contemporaneously filed Class Counsel Declaration).[1]

## I.    INTRODUCTION

The Begleys brought this lawsuit on behalf of themselves and a putative class of borrowers who were exposed to a potential misapplication of certain mortgage payments made under weekly and bi-weekly payment accelerated payoff plans administered by third-party ACI Worldwide, Inc. ("ACI"). (*See generally* Docs. 1, 18).  The Parties engaged in early settlement discussions, and through an intensive, five-month mediation process involving numerous rounds of confirmatory informal discovery counsel for the Begleys were enabled to assess the merits of their claims, Ocwen's defenses, and the material facts regarding the nature, cause and effect of the payment processing anomaly at issue in this case. (Class Counsel Decl. at ¶¶ 14-18 *see also* Docs. 31-1; 34-1; 36-1; 38).

Through that process, the Begleys determined that Ocwen acquired servicing rights in early 2013 to a large portfolio of mortgage loans previously serviced by GMAC Mortgage Company ("GMACM").  A number of those loans were enrolled

---

[1]  The Begleys employ certain capitalized words and phrases in this memorandum that are defined in Section 2 of the Parties' Settlement.

in ACI weekly or bi-weekly accelerated payoff programs.  Ocwen elected to accept payments from former GMACM borrowers under those ACI weekly and bi-weekly plans, and to continue making those ACI plans available for new enrollment by those former GMACM borrowers.  Effective February 1, 2017, and after this lawsuit was filed, Ocwen terminated all ACI payment plans (including the ACI weekly and bi-weekly plans).

Under the ACI weekly plan, one quarter (1/4) of a full monthly payment was withdrawn from a borrower's bank account each week by ACI and sent to Ocwen; under the  ACI bi-weekly plan, one half (1/2) of a full monthly payment was withdrawn from a borrower's bank account by ACI and sent to Ocwen  every two weeks.  These payments were accumulated in a suspense account until they were sufficient to fund the payment of a full contractual monthly mortgage payment. (Doc. 18-3 at 2).  Because the number of weeks in each month differ, there was an "extra" 1/2 payment under the ACI bi-weekly plan in two calendar months each year, and similarly, an "extra" 1/4 payment under the ACI weekly plan four times a year.[2]  Over the course of a 12-month period, a borrower who made all payments

---

[2] Under an ACI bi-weekly payment plan, a borrower would pay "one-half of the customer's total mortgage payment" every two weeks.  (Class Counsel Decl. at Ex.¶ 9).  "Twice in the year, the withdrawal schedule will withdraw 3 times in the month," such that, over the course of a 12-month period of time, the borrower would make a total of 26 half-payments and 13-full mortgage payments.  (*Id.*).  The two "extra" withdrawals, referred to in the Settlement as the ACI Extra Payments, should have been "applied to additional principal with the next month's payment application, as long as the loan is in a prepaid status."  (*Id.*).  Similarly, under a weekly payment plan, a borrower would pay one quarter of his total mortgage payment weekly, resulting in 52-

as and when expected under either plan would therefore make the equivalent of 13 full monthly mortgage payments each year. (*Id.*). The "extra" payments borrowers made in the same calendar month under either of these payment plans (the "ACI Extra Payments") were supposed to be immediately applied to reduce the principal balances of their loans at the time the ACI Extra Payments were made, thereby "helping [the borrowers] to reduce [their] loan balance[s] more quickly than scheduled," and thereby also producing compounded interest savings over the life of the loans. (*Id.*; *see also* Class Counsel Decl. at Ex. 9-11).[3]

Beginning in July 2013, Ocwen began migrating the servicing of all of the former GMACM loans from GMACM's legacy loan servicing software platform to the software platform Ocwen used for all other loans, a third party software platform known as REALServicing. Class Counsel's investigation allowed them to conclude that REALServicing's software was not fully compatible with the ACI weekly and bi-weekly payment plans. As a result, borrowers' ACI Extra Payments were, under certain conditions, applied towards future monthly payments not yet due on their loans instead of towards the immediate reduction of the loan's principal balances at the time the ACI Extra Payments were made (the "Extra

quarter payments (and 13-full payments) being made over a 12-month period. A borrower under a weekly payment plan would make four ACI Extra Payments over that 12-month period, collectively amounting to one additional total monthly mortgage payment.

[3] Under the ACI weekly and bi-weekly payment programs, an ACI Extra Payment would be applied to a loan's principal reduction only if the loan was a "Program-Compliant ACI Loan" at the time that ACI Extra Payment was made. (Class Counsel Decl. at Ex. ¶¶ 9-11).

Payment Processing Issue").  While applying payments towards future payments meant that the next contractual monthly payment due on the loan would be due on a date later (further into the future) than intended by the ACI plan, it also would cause borrowers to pay more total interest over the life of the loan as compared to what the ACI plan intended, and would result in the loan being paid off later than would have been the case had ACI Extra Payments been applied as intended by the relevant ACI plan.

A number of individual variables affect how and whether any individual loan might be affected by the Extra Payment Processing Issue.  For example, borrowers could deviate from the ACI payment schedule intentionally or unintentionally; fail to pay fees or escrow amounts as and when due; or fail to increase their withdrawals to match interest rate changes on adjustable rate loans.  Moreover, Ocwen had the ability to manually override payment applications.  For these and other reasons, and because the subsequent payment histories of transferred loans are not available in Ocwen's records but may be needed to fully remediate any payment applications on such transferred loans, Class Counsel concluded that a claim-in process was needed as to borrowers whose loans are still active with Ocwen or a subsequent loan servicer.  For loans that were paid off, cancelled and terminated, refinanced, or charged off while being serviced by Ocwen, it was determined that no claim-in process was needed because all

information needed to reverse and reapply payments was already in Ocwen's possession, and no future payments would be due on such loans.

Through due diligence and confirmatory discovery, the Begleys have confirmed that a total of 34,736 loans, involving 52,502 primary joint and/or co-borrowers, were enrolled in an ACI weekly or bi-weekly payment plan for some period of time while those loans were serviced by Ocwen on its REALServicing platform, and therefore were potentially impacted by the Extra Payment Processing Issue.   (Class Counsel Decl. at ¶ 11).   Ocwen terminated all ACI programs effective February 1, 2017.[4]

Over the course of this litigation, Ocwen has fully cooperated with the Begleys in their effort to identify and investigate the Extra Payment Processing Issue; in identifying those borrowers who are potentially affected by the Extra Payment Processing Issue; and in developing a plan to remediate any adverse effect the Extra Payment Processing Issue may have had on the processing of borrowers' ACI Extra Payments.   In fact, the Parties agreed early on to attempt to reach a resolution of this matter through private mediation overseen by former U.S. Attorney and retired United States District Judge Thomas E. Scott.   (Doc. 29 at 2). Through that protracted process, and the Parties' arms'-length negotiations and

---

[4] The ACI programs were terminable by Ocwen at will.  (Class Counsel Decl. at Ex. ¶ 18). Former GMACM borrowers can enroll in similar accelerated payoff programs offered by Ocwen that are compatible with REALServicing and not subject to the Extra Payment Processing Issue.

confirmatory due diligence discovery efforts, the Parties reached the instant settlement for which the Begleys now seek preliminary approval.  (*See, e.g.*, Docs. 31-1; 34-1; 36-1; 38).

The Parties' Settlement is a fair, reasonable and adequate compromise of the claims at issue in this lawsuit.   The Begleys' operative complaint—the First Amended Class Action Complaint (Doc. 18, the "FAC")—asserts claims on behalf of themselves and a putative class of borrowers for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, negligence, conversion, and violations of the Florida Deceptive and Unfair Trade Practices Act.  The relief sought under all of these claims is compensatory in nature, seeking an award of compensatory damages, interest, attorneys' fees and costs for injuries caused by the Extra Payment Processing Issue.  (Doc. 18 at 24-25).

In summary, the relief offered by the Settlement offers members of the Settlement Class a full accounting through manual reversal and reapplication in a test environment of all payments made while their loans were enrolled in an ACI weekly or ACI biweekly payment plan and being serviced by Ocwen on the REALServicing platform.  The Settlement also offers relief in the form of Account Adjustments to borrowers for which it is discovered their payments were originally misapplied, which is intended to provide Settlement Class Members with the opportunity to obtain a 100% remediation of any and all economic impact to their

9

ACI Loans on account of, or as a result of, any previously uncorrected payment misapplications due or caused by the Extra Payment Processing Issue.  Account Adjustment relief will be automatic as to loans with a Paid-Off Status.  For loans with an Active Status or Transferred Status, for whom changes to a loan may produce an earlier next payment due date along with a lower unpaid principal balance, Settlement Class Members will be required to submit a Claim Form for Account Adjustment Relief.  The right of exclusion provided by the Settlement also permits those who are not satisfied with the Settlement's terms to exclude themselves from the Settlement Class, and thereby preserve their right to bring an individual lawsuit against Ocwen if they choose to do so.  Moreover, the Parties have agreed to retain a third-party administrator, Class-settlement.com, to administer the Settlement and to provide the Settlement Class with notice *at Ocwen's expense*.  In other words, the Costs of Administration of the Settlement will not reduce the Account Adjustment relief being offered to the Settlement Class Members, so the Settlement Class Members will have the opportunity to obtain a 100% remediation.

The Begleys and Ocwen reached the Settlement through hard-fought, protracted, arm's-length negotiations that included four (4) separate days of mediation conducted over a five (5) month period time, during which breaks were taken to allow for the further and continued exchange of information.   The

Settlement is supported by confirmatory due diligence verification of the critical facts.   Because the Settlement offers each Settlement Class Member 100% remediation of any actual payment misapplications caused by the Payment Processing Issue, all without the need, cost and risk of litigation over Ocwen's defenses to the Begleys' claims, it is clear that the Settlement represents a fair, reasonable and adequate compromise warranting preliminary approval and conditional class certification for purposes of settlement and notice.   *Messineo v. Ocwen Loan Serv., LLC*, No. 15-cv-02076, 2017 WL 733219, at *9 (N.D. Cal. Feb. 24, 2017) (noting it is "a rare class action settlement which provides complete relief for all alleged harms").   Ocwen does not oppose this motion and will continue to cooperate in the settlement process.   *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1386 (D. Md. 1983) (a defendant's cooperation "is an appropriate factor for a court to consider in approving a settlement.").

## II.   **PROCEDURAL BACKGROUND**

The Begleys commenced this action on April 6, 2016.  (Doc. 1).  Ocwen filed a motion to dismiss on June 13, 2016.  (Doc. 9).  The Begleys then amended their complaint on June 29, 2016.  (Doc. 18).  In response, Ocwen filed a new motion to dismiss.  (Doc. 23).

In August 2016, the Parties held a Rule 26(f) planning conference, during which they agreed to move the Court for a stay of the proceedings to permit

mediation. (Doc. 29 at 1-2). The Court granted that request on August 26, 2016. (Doc. 30). The Parties jointly retained former United States Attorney and retired United States District Court Judge Thomas Scott as the mediator. (Doc. 29 at 2). The first mediation session took place on September 26, 2016. (*Id.*). Before that first mediation session, the Parties entered into agreements to informally exchange pertinent information and data in order to fully evaluate their claims, damages, allegations and defenses. (*Id.*). Class Counsel also retained experienced experts to evaluate the impact of the accelerated payment programs. (Class Counsel Decl. at ¶¶ 8-11, 22-24).

Although the Parties were not able to reach a settlement during the first mediation session, they agreed to reconvene the mediation at a later date, following additional confirmatory due diligence exchanges of information between them. (Doc. 31-1). Following such additional exchanges, the Parties participated in a second day of mediation on November 15, 2016. (Doc. 34-1). Again, the Parties were not successful in reaching global resolution but agreed to participate in a third mediation session following further exchanges of information and evaluation of that information by their experts. (*Id.*).

Two additional days of mediation were held on January 10-11, 2017. At this mediation, the Parties reached an agreement in principle to resolve the claims of the Settlement Class. (Doc. 36-1). The Parties were not, however, able to reach

an agreement on attorneys' fees and costs or a class representative service award. Negotiations on those issues continued between the Parties after the mediation, and an agreement on those issues was reached by February 3, 2017.  (Doc. 38).

The Parties then began drafting the necessary documentation supporting the settlement.  (Doc. 40).  Counsel for Ocwen and the Settlement Class jointly drafted and then executed the Settlement Agreement that memorializes and governs the Settlement.

Over the course of the Parties' negotiations, the Begleys obtained several hundred megabytes of electronic information and hundreds of pages of traditional "hard copy" documents in order to assess the strength of their claims, the number of potential class members, the potential extent of their injuries, and mechanisms to remediate those injuries.  (Class Counsel Decl. at ¶ 22).  The type of information produced to the Begleys included information on the ACI weekly and bi-weekly payment programs; the manner in which payments were applied by REALServicing on a sampling of loans; the number of loans potentially impacted by the Extra Payment Processing Issue, including details concerning those loans; and the payment histories on those loans while serviced by Ocwen on REALServicing for purposes of damage modeling and analysis.  (*Id.*).

## III.   <u>THE PRIMARY TERMS OF THE SETTLEMENT</u>

The Settlement resolves all claims of the Begleys and the Settlement Class

against Ocwen.  The details are contained in the Settlement Agreement.  (Class Counsel Decl. at Ex. 1 (hereinafter, the "Settlement")).  The primary terms of the Settlement are described below.

### A.    The Proposed Settlement Class

The proposed Settlement Class comprises the 52,502 primary, joint and co-borrowers on the 34,736 ACI Loans at issue in this litigation, and is defined as:

> [A]ll persons who were borrowers on home mortgage loans on which any payments were made to Ocwen under a weekly or biweekly accelerated payoff program administered by ACI while those loans were being serviced by Ocwen on the REALServicing loan servicing platform.

(Settlement at ¶ 2.1.44).  Excluded from the Settlement Class are "(a) Ocwen's board members and executive level officers; (b) persons who timely and properly exclude themselves from the Settlement Class as provided in this Agreement; (c) persons who, as of the date of entry of the Preliminary Approval Order, are in active bankruptcy proceedings; and (d) all federal judges, their spouses, and persons within the third degree of relationship to them."  (*Id.*).

### B.    Opt-Out Provisions

The Settlement allows any Settlement Class Members to opt-out of the Settlement and the Settlement Class.  Any Settlement Class Member who wishes to seek exclusion from the Settlement Class will be advised of his or her right to be excluded, and of the deadline and procedures for exercising that right.  (Settlement

at ¶¶ 5.2.2.3, 6.1-6.4).

### C.    <u>Relief Provisions</u>

The Settlement offers relief in the form of an accounting, through manual reversal and reapplication of all payments made while the loan was both (i) enrolled in an ACI weekly or bi-weekly payment plan and (ii) being serviced by Ocwen on REALServicing platform.   For loans where payment misapplications occurred, the Settlement offers Account Adjustments, which are intended to provide Settlement Class Members with the opportunity to receive relief equal in amount to any actual damages they may have suffered as a result of the Extra Payment Processing Issue.   (Settlement at ¶ 4.2).   Under the Settlement, the payment histories of all ACI Loans with a Paid-Off Status will automatically be reviewed.   The payment histories of all ACI Loans having an Active Status or Transferred Status will be reviewed only if Settlement Class Members submit Claim Forms.   The Claim Forms will, among other things, authorize Ocwen to obtain all necessary information from transferee servicers if the Claimant's loan has been transferred.   The resulting review will determine whether the Extra Payment Processing Issue adversely impacted the processing of ACI Extra Payments made by the borrowers while their ACI Loans were being serviced on Ocwen's REALServicing system and, if there was an adverse impact, have the effect of that impact remediated through an Account Adjustment.   (*Id.* at ¶¶ 4.4-

4.5).

The form in which Account Adjustments are distributed to Settlement Class Members will depend on the status of their loan at the time of relief implementation. For loans with a Paid-Off Status, Account Adjustments will be distributed by check. (Settlement at ¶ 4.4.3). Determination Notices will be sent to Claimants with loans having an Active Status or Transferred Status, explaining the amount of any proposed Account Adjustment and disclosing the loan's recalculated next payment due date. (*Id.* at ¶ 4.5.5). Claimants will then have 25 days to either accept that relief by signing and submitting an Acceptance Form, or challenge that relief calculation to a third-party neutral (Phillip E. Adams, Jr., of the National Academy of Distinguished Neutrals), whose decision shall be binding, final and non-appealable. (*Id.* at ¶¶ 4.5.6-4.5.8). Claimants who wish to decline the relief offered do not need to take any affirmative action. Account Adjustment relief to loans with an Active Status or Transferred Status will be distributed as account credits (*i.e.*, reductions) of the outstanding principal balances of the loans; however, if a loan has a Transferred Status and the transferee servicers refuse to cooperate in the calculation and implementation of Account Adjustment relief, then the loan will be treated as having Paid-Off Status as of the servicing transfer date and the Account Adjustment will be distributed by check. (*Id.* at ¶¶ 4.5.9.1-

4.5.9.2).[5]

All checks for Account Adjustment relief will state on their face that they will expire and become null and void unless cashed within one hundred and twenty (120) days after the date of issuance of the check.  (Settlement at ¶ 4.7).  A Settlement Class Member's failure to cash such a check within 120 days will constitute a waiver of his or her right to receive such relief, and unclaimed amounts will then be aggregated and paid to Homes For Our Troops, "a privately funded 501(c)(3) nonprofit organization that builds mortgage-free, specially adapted homes nationwide for severely injured Veterans Post-9/11, to enable them to rebuild their lives."  https://www.hfotusa.org/mission/ (last visited Feb. 24, 2017). (*Id.*).

## D.   **Release**

In exchange for the relief described above, and upon entry of a Final Order and Judgment approving the Settlement, the Begleys and the Settlement Class will release Ocwen and certain of its related and affiliated entities (the "Released Parties," as further defined in Paragraph 2.1.41 of the Settlement) of, *inter alia,* all

---

[5] Clearly, "[i]t does not follow as a matter of course that money must be paid to make every settlement a reasonable one." *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449, 453 (N.D. Ala. 1974), *aff'd.*, 511 F.2d 1440 (5th Cir. 1975).  In fact, principal balances corrections are preferable to cash relief for active and transferred loans because they ensure that there can be no further *prospective effect* from any actual prior payment misapplications.  Account crediting of relief (where available and applicable) accomplishes that directly, by ensuring that a loan's principal balance is adjusted to its correct amount, thereby addressing the effect of any past payment misapplications and ensuring that future interest charges are based on the correct principal balance.

claims related to Ocwen's application or misapplication of payments made by a Settlement Class Member under one of the ACI weekly or bi-weekly accelerated payoff programs while his or her loan was enrolled in an ACI weekly or biweekly payment plan and was being serviced by Ocwen on the REALServicing loan servicing platform, and from any claims arising in whole or in part from the termination of the ACI programs.   (Settlement at ¶ 8.1).   In other words, the Settlement contemplates a release specific to the subject matter addressed in this Action, and does not contemplate a general release of any and all claims of any kind against Ocwen.   The Settlement will not alter, extinguish, release or modify the terms of the Settlement Class Members' loans except to the extent of any Account Adjustments to which Settlement Class Members may be entitled under the Settlement.   (*Id*. at ¶ 8.6).

### E.   Notice and Settlement Administration

The Parties have agreed to the appointment of Class-settlement.com to act as the Settlement Administrator and to provide notice to the proposed Settlement Class.   (Settlement at ¶ 2.1.43; *see also id.* at ¶¶ 5.1-5.4).   The costs of distributing notice and for settlement administration are to be paid separately by Ocwen, outside of, and in addition to, the Account Adjustment relief being offered to the Settlement Class Members.   (*Id.* at ¶¶ 2.1.20, 4.8).

### F.   Preliminary Injunctive Relief

If given preliminary approval, the Settlement calls upon the Court to enter certain preliminary injunctive relief, temporarily barring, during the Court's consideration of whether final approval should be given to the Settlement, (a) the initiation of any new, or continued prosecution of any existing, lawsuit besides this Action asserting any *class action or representative claims* limited to those claims arising out of the Extra Payment Processing Issue;[6] and (b) unless and until such Settlement Class Member submits a timely and valid written request to be excluded from the Settlement Class, the initiation of any new, or continued prosecution of any existing, *individual* lawsuit asserting claims arising out of the Extra Payment Processing Issue.  (Settlement at ¶ 5.2.2.7).

## G.    Class Representative Service Award

Under the Settlement, Class Counsel have reserved the right to seek a reasonable Service Award, not to exceed $5,000, to be paid jointly to the Begleys for their services as the representatives of the Settlement Class.  (Settlement at ¶ 9.2).  The Service Award would be paid separately by Ocwen from the relief being offered to the Settlement Class Members, and would be in addition to any relief the Begleys may receive as an Account Adjustment.  (*Id.*).  The Service Award is intended to recognize the time and effort expended by the Begleys on behalf of the Settlement Class in assisting Class Counsel with the prosecution of

---

[6] The "Extra Payment Processing Issue" is specifically defined in section 2.1.23 of the Settlement Agreement.

this case and negotiating the relief the Settlement proposes to confer to the Settlement Class Members, as well as the exposure and risk the Begleys incurred by participating and taking a leadership role in this litigation. (*Id.*); *see also, e.g.*, *Walters v. Cook's Pest Control, Inc.*, No. 2:07-cv-00394, 2012 WL 2923542, at *14 (N.D. Ala. July 17, 2012) ("[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action.") (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006)). *Accord* 2 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 6:28 at 197 (10th ed. 2013) ("[T]here is near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000 - $20,000."). The Settlement is not conditioned upon any Service Award being approved by the Court. (*Id.* at ¶ 9.5).

## H.    **Attorneys' Fees and Expenses**

Under the Settlement, Class Counsel have also reserved the right to petition the Court for an award of reasonable attorneys' fees and reimbursement of costs and expenses incurred in the prosecution of this case, in an amount not to exceed $2,000,000. (Settlement at ¶ 9.1). The Attorneys' Fees and Expenses provision was separately and independently negotiated by the Parties apart from the class settlement provisions, in an arm's-length negotiation. Any such Attorneys' Fees

20

and Expenses award would be paid separately by Ocwen from the relief being offered to the Settlement Class Members.  (*Id.* at ¶¶ 9.1).  The Settlement is not conditioned upon any Attorneys' Fees and Expenses award being approved by the Court.  (*Id.* at ¶ 9.5).

## IV.    THE SETTLEMENT CLASS SHOULD BE CONDITIONALLY CERTIFIED

Before evaluating the fairness, adequacy and reasonableness of the Parties' Settlement, the Court must "make a preliminary determination" as to whether the proposed Settlement Class "satisfies the criteria [for class certification] set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 at 321 (2004).  In other words, while "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits," *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992),  a court must still "find that the prerequisites for class certification under Rule 23(a) and (b) of the Federal Rules of Civil Procedure are met."  *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *1 (S.D. Fla. Oct. 7, 2013) (quotations omitted).[7]

---

[7]  *See also Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting "the strong judicial policy in favor of settlements, particularly in the class action context."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) (there is a "strong presumption in favor of voluntary settlement agreements" which "is especially strong in class actions and other complex cases"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement.").

To be certifiable, Rule 23(a) requires that a proposed class meet four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. FED. R. CIV. P. 23(a)(1)-(4).  In addition, where, as here, a plaintiff seeks certification of a class under Rule 23(b)(3), she must demonstrate "that questions of law or fact common to class members predominate over any questions affecting only individual members," and that use of the class device "is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### A.  The Settlement Class is Sufficiently Numerous

Rule 23(a)'s numerosity requirement is met if the potential class is so numerous that the alternative—joinder of individual plaintiffs—is "impracticable." FED. R. CIV. P. 23(a)(1).  "While there is no predetermined threshold number of plaintiffs required to certify a class, in the Eleventh Circuit, a prospective class consisting of more than forty members is generally deemed sufficient." *Navelski v. Int'l Paper Co*., No. 3:14-cv-445, 2017 WL 1132569, at \*15 (N.D. Fla. Mar. 25, 2017) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)).

Here, the Settlement Class is comprised of all 52,502 of the primary, joint and co-borrowers on the 34,736 loans that were enrolled in an ACI weekly or bi-weekly payment plan while their loans were being serviced by Ocwen on the

22

REALServicing platform.  (Class Counsel Decl. at ¶¶ 11, 45).  Accordingly, the proposed Settlement Class easily satisfies Rule 23(a)'s numerosity requirement.

## B.   The Commonality Requirement Is Satisfied

Rule 23(a)(2) requires there be some "questions or law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  In other words, not all questions of law and fact at issue in a case need to be common—instead, "for purposes of Rule 23(a)(2) even a single common question will do."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  A question of law or fact will be common to the class if it is "of such a nature that it is capable of classwide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350; *see also Navelski*, 2017 WL 1132569, at *15.

Here, the claims of the Begleys and the Settlement Class present a number of common factual and legal questions, including but not limited to:

- whether Settlement Class Members' ACI Extra Payments were misapplied their towards future monthly payments not yet due instead of reducing the principal balances of their loans at the time those ACI Extra Payments were made;

- whether Ocwen's practices and omissions in failing to systematically identify and rectify the Extra Payment Processing Issue breached the terms of the Settlement Class Members' home mortgage loans and ACI agreements, violated the implied covenant of good faith and fair dealing associated with those loans and agreement, resulted in Ocwen being unjustly enriched at the Settlement Class Members' expense, and amounted to negligence by Ocwen in the processing of their ACI

    Extra Payments;

- whether Ocwen's practices and omissions in failing to systematically identify and rectify the Extra Payment Processing Issue breached the terms of the Settlement Class Members' home mortgage loans and ACI agreements and, for Florida residents, violated the Florida Deceptive and Unfair Trade Practices Act § 501.201, Fla. Stat., *et seq.*; and

- whether the Begleys and the Settlement Class Members are entitled to recover for injuries proximately caused by Ocwen's alleged unlawful conduct, including through actual damages, interest, attorneys' fees, filing fees and reasonable costs of suit. (Doc. 18 at ¶ 47).

In other words, this case presents ***several*** common questions of law and fact. These issues are susceptible to classwide proof, and their resolution would "affect all of a significant number of the putative class members" in a manner "apt to drive the resolution of th[is] litigation." *Wal-Mart Stores*, 564 U.S. at 350. Because these common issues can be resolved for all members of the proposed Settlement Class in a single adjudication, through common classwide proof, and are the central focus of this litigation, Rule 23(a)(2)'s commonality requirement is also satisfied.

## C.   <u>The Typicality Requirement Is Satisfied</u>

    Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). Therefore, "[a] class representative must possess the same interest and suffer the same injury as the class members." *Cooper v. Southern Co.*, 390 F.3d 695, 713

(11th Cir. 2004).   "Yet, the '[c]lass members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification.'"   *Ault v. Walt Disney World Co.,* 692 F.3d 1212, 1216 (11th Cir. 2012) (quotation omitted).   Typicality therefore exists where "the claims of the class and its representatives arise from the same events, practice, or conduct and are based on the same legal theories." *Navelski*, 2017 WL 1132569, at *15.

Here, the Begleys' claims arise from the same events, practices, and conduct that give rise to the claims of all other Settlement Class Members.   The Begleys and the members of the proposed Settlement Class had loans that were serviced for some period of time by Ocwen, and they were all enrolled in ACI weekly or bi-weekly payment plans while their loans were being serviced by Ocwen.   The Extra Payment Processing Issue could effect the processing of ACI Extra Payments made by the Begleys and the Settlement Class Members in the same way.   In other words, "the same unlawful conduct affected both [the Begleys] and the rest of the [proposed Settlement C]lass." *Navelski*, 2017 WL 1132569, at *15.   And the Begleys' claims and those of the members of the proposed Settlement Class are based on the same legal theories—that Ocwen's loan servicing system systematically misapplied ACI Extra Payments to future contractual payments

instead of applying those payments to directly reduce the principal balances of their loans at the time those payments were made, in violation of the terms of the ACI weekly and bi-weekly payment programs.  Because the claims of the Begleys and the absent class members concern the same alleged conduct by Ocwen, allege the same harm, and arise from the same legal theories, Rule 23(a)(3)'s typicality requirement is satisfied.

### D.   The Begleys and Class Counsel Are Adequate Representatives

"Rule 23(a)(4) requires that both the named plaintiffs and their counsel will 'fairly and adequately protect the interests of the class." *Navelski*, 20017 WL 1132569, at *16 (quoting FED. R. CIV. P. 23(a)(4)).   "The adequacy of representation requirement encompasses two separate inquires: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby v. JRHBW, Realty, Inc.,* 513 F.3d 1314, 1323 (11th Cir. 2008).

Here, no conflict exists between the named and unnamed class members because their interests are aligned.  The Begleys are members of the Settlement Class they seek to represent.  They and the members of the proposed Settlement Class were all enrolled in ACI weekly or bi-weekly payment plans while their loans were serviced by Ocwen on its REALServicing system, and therefore the processing of any ACI Extra Payments they made is potentially affected in the

same way by the Extra Payment Processing issue.  As a result, "[t]he economic interests and litigation objectives of [the Begleys and] all class members are . . . entirely consistent," even though their "damages will differ in degree."  *Navelski*, 2017 WL 1132569, at *16.

Moreover, the Begleys have and will continue to adequately protect the interests of the Settlement Class.  The Begleys were integral in identifying the Extra Payment Processing issue, and continue to stay actively involved in the litigation, fact finding and investigation and the Parties' ongoing settlement negotiations.  (Class Counsel Decl. at ¶ 34); *see also Spinelli v. Capital One Bank*, 265 F.R.D. 598, 602 (M.D. Fla. 2009) (holding class representative who was knowledgeable about the case and lacked any conflict of interest with the class was adequate representative); *Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013) (holding class representative with "no antagonism between [his] interests and those of the putative class members" met the adequacy requirement).  Further, while the Settlement provides Class Counsel with the right to seek a $5,000 Service Award payable jointly to the Begleys, "[i]ncentive payments to class representatives do not, by themselves, create an impermissible conflict between class members and their representatives."  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015); *see also In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036, 2014 WL 12557836,

at *9 (S.D. Fla. Apr. 1, 2014) (approving $5,000 service award to class representative, and noting "[t]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action.") (quotation omitted); *Walters*, 2012 WL 2923542, at *14 (same).

Additionally, Class Counsel are qualified and competent, and will continue to adequately protect the interests of the proposed Settlement Class. Class Counsel regularly engage in the litigation of class action and complex litigation lawsuits. (Class Counsel Decl. at ¶¶ 33, 48); *see also City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 651 (S.D. Fla. 2010) ("Counsel will be deemed adequate if they are shown to be qualified, adequately financed, and possess sufficient experience in the subject matter of the class action."). Moreover, Class Counsel have diligently investigated, prosecuted and dedicated substantial resources to this litigation both before, during and after mediation, and will continue to do so throughout the pendency of this case. (*Id.* at ¶¶ 7-11). As such, the Begleys and Class Counsel will adequately represent the members of the Settlement Class and their interests.

### E.    The Settlement Class Satisfies Rule 23(b)(3)'s Requirements

In addition to the four requirements of Rule 23(a), the proposed class must also satisfy at least one provision of Rule 23(b). *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). Here, certification of the Settlement Class is

sought under Rule 23(b)(3), which requires that (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual class members; and (2) use of the class device is the superior method for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). Both requirements are met here.

### 1.    <u>Common Questions of Law and Fact Predominate</u>

The predominance requirement focuses on whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Such cohesiveness exists where questions of law or fact common to the class will turn on "the same evidence," *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016), and their resolution will "have a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Carriuolo*, 823 F.3d at 985 (quotation omitted). In other words, a common question of law or fact will predominate if "the addition or subtraction of any of the plaintiffs to or from the class [will] not have a substantial effect on the substance or quantity of evidence offered" to resolve that question. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009) (quotation omitted).

However, Rule 23(b)(3) requires only "a showing that questions common to

29

the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 113 S. Ct. 1184, 1191 (2013). And a plaintiff is not required "to prove that each element of her claim is susceptible to classwide proof." *Id.* at 1196. Rather, she need only show that common questions will predominate with respect to her case as a whole. *Id.* In making this determination, the individualized nature of damage calculations alone cannot "preclude class certification." *Carriuolo*, 823 F.3d at 988 (collecting cases); *see also Brown*, 817 F.3d at 1239; *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("[T]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

Here, the commonality requirement is easily met. The evidence necessary to prove liability for the Begleys' claims is the same as it would be for each Settlement Class Member. The question of the existence of the Extra Payment Processing Issue, along with its effect on the processing of the Settlement Class Members' ACI Extra Payments, are not only common to the Settlement Class, but are the predominate consideration in deciding whether Ocwen is liable to the Begleys and Settlement Class Members. *See, e.g.*, *Demsheck v. Ginn Dev. Co., LLC*, No. 3:09-CV-335-J-25TEM, 2013 WL 12177811, at *3 (M.D. Fla. Sept. 30, 2013) (common questions predominated because the "crux of all class members'

30

claims" was an allegation that the defendant treated them identically in failing to provide them with a property report before they signed a real estate purchase contract).   And those questions are susceptible to resolution through common, generalized proof—namely, evidence concerning how Ocwen processed ACI Extra Payments under ACI weekly or bi-weekly payment plans.   (Class Counsel Decl. at ¶¶ 44, 46).   In other words, the evidence the Begleys would offer at an individual trial to establish liability would be the same sort of evidence that every member of the proposed Settlement Class would also have to offer at their own individual trials.

### 2.   The Class Device is the Superior Method of Adjudication

The superiority prong of Rule 23(b)(3) requires a court to determine whether use of the class action device "is superior to other available methods for fairly and efficiently adjudicating the controversy."   FED. R. CIV. P. 23(b)(3).   "The focus of this inquiry is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs."   *Navelski*, 2017 WL 1132569, at *18 (quotation omitted).   Factors relevant to the superiority analysis include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; and (3) the desirability or undesirability of concentrating the litigation of the

31

claims in the particular forum. FED. R. CIV. P. 23(b)(3).[8]

Here, use of the class action device is superior to other available procedural methods for adjudicating the claims at issue in this case. Class Counsel are unaware of the filing of any other actions against Ocwen concerning the Extra Payment Processing Issue. This is not surprising, as it is a difficult issue to spot without careful review of one's mortgage records, and quite likely that the members of the Settlement Class, even if they had spotted the issues, would have little interest in pursuing their own separate actions given that "this matter involves relatively small individual claims compared to the cost of litigation complexing legal issues [like the Extra Payment Processing Issue] against" Ocwen. *Navelski*, 2017 WL 1132569, at *18; *see also Amchem,* 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). And although the membership of the Settlement Class is readily identifiable, the joinder of that number of persons is impracticable.

At the same time, the use of the class action mechanism is likely the only practical way of resolving the claims of the tens of thousands of Settlement Class Members, while at the same time avoiding the potential for repetitious litigation

---

[8] Rule 23(b)(3) also lists a fourth factor—the likely difficulties in managing a class action. However, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620.

and inconsistent adjudications if the claims were pursued individually. Individual litigation against Ocwen could result in inconsistent judgments. Under these circumstances, use of the class mechanism is the superior alternative for resolving this dispute as it will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Fifth Moorings Condo., Inc. v. Shere*, 81 F.R.D. 712, 719 (S.D. Fla. 1979). After all, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without effective redress unless they may employ the class-action device." *Deposit Guaranty Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980).

Accordingly, use of the class action mechanism here is the superior method for adjudicating this controversy, and because all other requirements for class certification under Rule 23 are met, the proposed Settlement Class should be conditionally certified for purposes of settlement only.

## V. PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED

After the Court makes a determination that the proposed class satisfies the requirements for certification under Rule 23, the Court must then make a "preliminary fairness evaluation" of the proposed class settlement based on the "briefs, motions, [and] informal presentations by parties." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 at 320-21 (2004). Here, the Court should

33

preliminarily approve the Settlement not only because public policy favors the settlement of complex class actions such as this one (*see* note 6 *supra*), but also because the Settlement offers *full corrective relief* for any economic impact to a Settlement Class Member's ACI Loan caused by any previously uncorrected misapplication of an ACI Extra Payment made while the loan was being serviced by Ocwen on REALServicing.   The damages sought in this Action are purely compensatory in nature (Doc. 18 at 24), and it is "a rare class action settlement which provides complete relief for all alleged harms."   *Messineo*, 2017 WL 733219, at *9 (noting class settlement recoveries of 9% are generally considered a "substantial achievement," and approving settlement that offered class members the opportunity to submit claims "to remediate any actual damages they may have suffered").   At the same time, the Settlement allows Settlement Class Members dissatisfied with the Settlement's terms to exclude themselves from the Settlement Class to pursue their own lawsuit against Ocwen.

### A.   <u>The Role of the Court</u>

Federal Rule of Civil Procedure 23(e) requires judicial approval of any compromise of claims brought on a class action basis.   Such review involves a well-established two-step process involving (1) preliminary approval of the settlement and the method and form of class notice; and (2) final approval after notice and a fairness hearing.  *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir.

1982).   The purpose of the first step of preliminary approval "is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id*. at 621 n.3.   In this regard, the Settlement should be preliminarily approved if it (i) "appears to fall within the range of possible approval," and (ii) "does not disclose grounds to doubt its fairness or other obvious deficiencies." *In re Inter-Op Hip Prosthesis Liab. Litig*., 204 F.R.D. 330, 350 (N.D. Ohio 2001); *see also Family Med. Pharm., LLC v. Holdings*, No. 15-0563, 2016 WL 7320885, at *5 (S.D. Ala. Dec. 14, 2016) ("Preliminary approval . . . does not involve a determination of the merits of the proposed settlement or affect the substantive rights of any class member. . . . [T]he court simply determines whether the proposed settlement falls within the range of possible approval."); *Smith v. Wm. Wrigley Jr. Co*., No. 09-60646-CIV, 2010 WL 2401149, at *2 (S.D. Fla. June 15, 2010) ("Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason.").

Approval of a proposed class action settlement is a matter within the discretion of the court. *Bennett v. Behring Corp*., 737 F.2d 982, 986 (11th Cir. 1984).  Such discretion is conferred in recognition that "evaluation of [a] proposed settlement in this type of litigation . . . requires an amalgam of delicate balancing,

gross approximations and rough justice." *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1385 (S.D.N.Y. 1972), *rev'd on other grounds by* 495 F.2d 448 (2d Cir. 1974); *see also Poertner v. Gillette Co.*, 618 F. App'x 624, 627 (11th Cir. 2015). In exercising that discretion, courts have recognized that as a matter of sound public policy, settlements of disputed claims are encouraged and the settlement approval process should "not be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation . . . ."); *accord In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."). Recognizing that a settlement represents an exercise of judgment by the parties, it has been consistently held that the function of a court reviewing a settlement is neither to rewrite the parties' agreement nor to try the case by resolving issues left unresolved by the settlement. *See, e.g.*, *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1160 (11th Cir. 1983) ("Courts are not permitted to modify settlement terms or in any manner to rewrite the agreement reached by the parties.").

## B.     The Criteria for Preliminary Approval

To grant preliminary approval, the Court need only find that the terms of the

Settlement fall within the range of possible final approval.  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 at 320-21; *accord Lazy Oil Co. v. Wotoco Corp.*, 95 F. Supp. 2d 290, 338 (W.D. Pa. 1997), *aff'd.*, 166 F.3d 581 (3d Cir. 1999) (in considering a class settlement, the proper inquiry is "whether the recovery falls within th[e] range of reasonableness, not whether it is the most favorable possible result of litigation") (citation omitted).  The range "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981) ("[T]he essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness.").

Thus, "[i]t is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable."  *Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993) (citation omitted).  The Court should instead "consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation," because it is "proper to take the bird in

hand instead of a prospective flock in the bush." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

Accordingly, the relevant inquiry is "whether the recovery falls within that range of reasonableness, [and] not whether it is the most favorable possible result of litigation." *Lazy Oil Co.*, 95 F. Supp. 2d at 338. In addition, courts should also assess whether "the proposed settlement appears to be the product of serious, informed, non–collusive negotiations," and whether it "improperly grant[s] preferential treatment to class representatives or segments of the class" to ensure the Settlement's procedural fairness. *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. at 102.

In making any preliminary approval determination, the Court need not reach any ultimate conclusions on the substantive factual or legal issues presented in the case. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) (in considering whether to approve a class settlement, courts "do not decide the merits of the case or resolve unsettled legal questions"). "It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the Court try the case which is before it for settlement . . . such procedure would emasculate the very purpose for which settlements are made." *Grinnell Corp.*, 495 F.2d at 462. Nor should the court "make the proponents of the agreement justify each term of settlement against a hypothetical or speculative measure of what

concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972).

### C.    The Settlement is Procedurally Fair

To warrant preliminary approval, the terms of a class action settlement should reveal that it is "the product of serious, informed, non-collusive negotiations." *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. at 102. In making this determination, courts begin with a presumption of good faith in the negotiating process. *See Lee v. Ocwen Loan Serv., LLC*, No. 14-CV-60649, 2015 WL 5449813, at*11 (S.D. Fla. Sept. 14, 2015) ("Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion."); *Saccoccio v. JP Morgan Chase Bank, NA*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) ("There is a presumption of good faith in the negotiation process.").

Here, the record supports the procedural fairness of the proposed Settlement. The Parties were separately represented by able and experienced counsel in complex actions and consumer litigation, and "a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel." MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42.  The Parties' negotiations were protracted, continuing over a five-month period, with the assistance of experts working closely with

reams of data produced in the confirmatory discovery and due diligence process with respect to the claims at issue.  (Class Counsel Decl. at 8-11, 22-24).  Thus, the Parties were not "groping in the darkness" during their negotiations, *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977), and the Settlement was certainly not "the product of uneducated guesswork."  *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981); *accord Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution").  On top of that, the Parties' negotiations occurred within the context of mediation conducted by retired United States District Judge Thomas E. Scott.  (Doc. 29 at 2; *see also* Doc. 36-1; Doc. 34-1; Doc. 31-1).  The participation of such a respected neutral in the settlement negotiation process should give the Court "confidence that [the negotiations] were conducted in an arm's-length, non-collusive manner."  *In re AMF Bowling,* 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004).[9]

In addition, there is no evidence suggesting that the Begleys or Class Counsel are unfairly benefiting at the expense of the Settlement Class.  The proposed compensation to Class Counsel of up to $2,000,000 in Attorneys' Fees and Expenses is sufficiently reasonable at this stage to warrant preliminary

---

[9] *See also Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928, 2010 WL 10959223, at *21 (N.D. Ala. Apr. 27, 2010) (fact that "negotiations were supervised by a highly experienced mediator" evidenced arms-length nature of class settlement), *aff'd.*, 68 F.3d 1233 (11th Cir. 2011).

approval, in light of the total potential economic impact in terms of the relief being offered to the Settlement Class.  *See* (Class Counsel Decl. at 24, 27, 32-35).[10]

Moreover, the proposed Settlement does not grant preferential treatment to the Begleys, who may receive up to $5,000 jointly as a service award as compensation for their time, effort, and inconvenience in connection with acting as class representatives in this matter.  *Camp v. City of Pelham*, No. 2:10-cv-01270, 2014 WL 1764919, at *6 (N.D. Ala. May 1, 2014) ("[t]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action"); *Warren v. Cook Sales, Inc*., No. CV 15-0603, 2017 WL 325829, at *8 (S.D. Ala. Jan. 23, 2017) (service award of $5,000 "fair and

---

[10] *See also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999) (affirming fee award of 33 1/3% of settlement value); *Wolff v. Cash 4 Titles*, No. 03–22778–CIV, 2012 WL 5290155, at *5 (S.D. Fla. Sept. 26, 2012) (approving 33% award, and noting "[t]he requested fee is entirely consistent with fee awards in comparable cases nationwide, within the Eleventh Circuit, and within the Southern and Middle Districts of Florida."); *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185, 1204 (S.D. Fla. 2006) (31 1/3% fee award); *In re Friedman's, Inc. Sec. Litig*., No. 1:03-cv-3475, 2009 WL 1456698, at *2 (N.D. Ga. May 22, 2009) (30% fee award); *Eslava v. Gulf Tel. Co., Inc*., No. 04-0297, 2007 WL 4105977, at *2 (S.D. Ala. Nov. 16, 2007) (30% award); *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991) (noting that fee awards are generally subject to "an upper limit of 50% of the [settlement] fund.").

A 1996 Federal Judicial Center Study covering all class actions in four selected federal district courts found that attorneys' fee "median rates ranged from 27% to 30%."  Thomas E. Willging, Laurel L. Hooper, and Robert J. Niemac, *Symposium: The Institute of Judicial Administration Research Conferences on Class Actions: Class Actions and the Rulemaking Process: An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges* (1996), at 69.  This finding is in line with an analysis of fee awards in class actions conducted from January 1995 to June 1996 by National Economic Research Associates, an economics consulting firm.  This study reports on the central questions of attorneys' fees: "Regardless of case size, fees average approximately 32 percent of the settlement."  Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions*, National Economic Research Associates (November 1996), at 12-13.

reasonable").[11]  There is nothing collusive about the Begleys' and Class Counsel's reservation of the right to seek such awards.  Accordingly, there is no evidence or settlement term that suggests the Settlement is tainted by fraud or collusion.

### D.    The Settlement is Substantively Fair

In evaluating whether to grant preliminary approval, the Court need only determine whether the terms of the Settlement fall within the range of possible final approval.  *See, e.g.*, *Lazy Oil Co.*, 95 F. Supp. 2d at 338 (in considering a class settlement, the inquiry properly is "whether the recovery falls within th[e] range of reasonableness, not whether it is the most favorable possible result of litigation").

After a settlement in principle was negotiated, the Parties worked to craft terms of the proposed Settlement and a plan for notice to the Settlement Class. The Settlement affords relief that is not only within the range of possible final approval, but which closely tracks what is arguably the best possible recovery available to the Begleys and the Settlement Class Members if they were to successfully litigate this Action through trial.  The Begleys claim that they and the

---

[11] *See also Almanzar v. Select Portfolio Serv., Inc.*, No. 1:14-cv-225, 2016 WL 1169198, at *4 (S.D. Fla. Mar. 25, 2016) ($5,000 service award "fair, reasonable, and adequate"); *Morefield v. NoteWorld, LLC*, Nos. 1:10-CV-00117 & 1:11-CV-00029, 2012 WL 1355573, at *4 (S.D. Ga. Apr. 18, 2012) (same); *Carnegie v. Mutual Sav. Life Ins. Co.*, No. Civ.A.CV-99S3292, 2004 WL 3715446, at *24 (N.D. Ala. Nov. 23, 2004) (same).  *Accord* 2 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 6:28 at 197 (10th ed. 2013) ("[T]here is near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000-$20,000.").

other Settlement Class Members were subjected to the same unlawful payment crediting practices by Ocwen.  (Doc. 18 at ¶¶ 47-51).  The primary objective of this Action was compensatory: to correct the effects of any payment misapplications. (Doc. 18 at 24).  The relief offered by the Settlement is in the nature of an accounting, and it accomplishes the Operative Complaint's make-whole objective for each ACI Loan encompassed within the Settlement Class.  Through the Settlement, Settlement Class Members can have their ACI Loan reviewed under the Audit and Remediation Protocol to evaluate economic impact to each account and, receive an Account Adjustment *in the full amount necessary* to remediate any actual loan impact suffered.

In purely quantitative terms, settlement relief allowing Settlement Class Members an opportunity to recover 100% of any actual adverse loan impact suffered by them is unquestionably an excellent result for the Settlement Class. Since 1995, class action settlements typically "have recovered between 5.5% and 6.2% of the class members' estimated losses."  *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001).  Courts both within and outside this Circuit have recently approved a number of mortgage servicing-related class action settlements providing far lower percentages of recovery.[12]  Here, the Settlement

---

[12] *See, e.g.*, *Lee*, 2015 WL 5449813, at *6 (approving settlement offering 12.5% recovery); *Montoya v. PNC Bank, NA*, No. 14-20474-CIV, 2016 WL 1529902, at *11  (S.D. Fla. Apr. 13, 2016) (same); *Gaudin v. Saxon Mortg. Servs., Inc.*, No. 11-cv-01663, 2015 WL 7454183 *6

offers a 100% recovery of actual damages, rendering it "a rare class action settlement which provides complete relief for all alleged harms." *Messineo,* 2017 WL 733219, at *9.

Qualitative considerations further bolster the reasonableness of the Settlement.  If not settled, there exists real potential for years of further litigation, as well as a possibility that Ocwen could prevail on the merits or defeat contested class certification.  (*See generally* Settlement at ¶ 1.12).  Although the Begleys are confident that they could successfully overcome these arguments and any others, if the Court agreed with Ocwen on any of its defenses, certification could be denied or class members could be left with no recovery at all.  *See, e.g.*, *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 526 (noting that in the class action settlement context, it is "proper to take the bird in hand instead of a prospective flock in the bush."); *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007) (noting that settlement was approved where "the risk of going forward was substantial" despite the court's belief that case had merit).

Finally, "[i]t is neither required, nor is it possible, for a court to determine that the settlement is the fairest possible resolution of the claims of every

---

(N.D. Cal. Nov. 23, 2015) (13.6% recovery); *Jackson v. Wells Fargo Bank, NA*, 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015) (19.5% recovery); *Arnett v. Bank of Am., NA*, No. 3:11-cv-1372, 2014 WL 4672458 *6 (D. Or. Sept. 18, 2014) (13.3% recovery); *Rose v. Bank of Am. Corp.*, Nos. 5:11-CV-02390, 5:12-CV-04009, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) (approving settlement offering 4% relief based on average recovery of $20 to $40 per class member as compared to $500 to $1,500 in potential damages).

individual class member, rather the settlement, *taken as a whole*, must be fair, adequate and reasonable." *Shy v. Navistar Int'l Corp.*, No. C-3-92-333, 1993 WL 1318607, at *2 (S.D. Ohio May 27, 1993) (emphasis in original). This Settlement is sufficiently within the range of possible final approval to justify its preliminary approval.

## VI.   THE PROPOSED NOTICE PLAN SHOULD ALSO BE APPROVED

The threshold inquiry concerning the sufficiency of class notice is whether the notice is reasonably calculated to apprise the class of the pendency of the action, of the terms of the proposed settlement, and of the class members' rights to opt out or object. *Eisen v. Carlisle & Jaqueline*, 417 U.S. 156, 173-74 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). Notice of a class settlement ensures that the due process rights of class members are protected. *See, e.g.*, *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176-77 (5th Cir. 1975). Accordingly, a court should ensure that "the best notice that is practicable under the circumstances" is disseminated "in a reasonable manner to all class members who would be bound by the proposal," including through "individual notice to all [class] members who can be identified through reasonable effort." FED. R. CIV. P. 23(c)(2)(B), (e)(1).

The Court is vested with considerable discretion in fashioning notice—both in terms of the notice's content and manner of distribution. 7B CHARLES A.

WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1797.6, at 200 (3d ed. 2005). This is particularly true within the context of a class action settlement. *See, e.g.*, *Handschu v. Special Serv. Div*, 787 F.2d 828, 833 (2d Cir. 1986); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 913 (E.D. La. 2012), *aff'd.*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014). Such discretion is limited only by the requirement that the contents of the notice "inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the [settlement fairness] hearing." 2 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS (FOURTH) § 8:32 (2002). After all, Rule 23(e) notice is designed to be only a summary of, and not a complete recitation regarding, the litigation and proposed settlement. *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975) ("Class Members are not expected to rely upon the notices as a complete source of settlement information."). As such, the notice need not be unduly specific, or reference every term of the proposed settlement. *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) ("The standard for the adequacy of a settlement notice . . . is measured by reasonableness," and "the notice need not include 'every material fact' or be 'overly detailed.'"); *Churchill Vill., LLC v. Gen. Elec.*, 361

F.3d 566, 575 (9th Cir.2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.").   This is in keeping with the principle that Rule 23(e) notice is bound only by Constitutional Due Process principles, such that the notice need only be "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the [settlement proposed] and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314 (citation omitted).

### A.    The Content of the Proposed Notice is Appropriate

As a general rule, Rule 23 notice should:

(1)    define the class, and disclose whether certification is limited or conditional in nature;

(2)    describe the litigation, including the allegations of the complaint;

(3)    summarize the essential terms of the proposed settlement;

(4)    describe the options available to each class member under the proposed settlement, along with any deadlines;

(5)    disclose any requested allowances for attorneys' fees and special benefits to the class representatives;

(6)    indicate the time and place of the fairness hearing and describe its purpose;

(7)    describe the procedures for filing appearances and objections;

(8)    disclose how class members can contact class counsel; and

> (9)    explain how class members may inspect and obtain documents relating to the settlement and the entire litigation.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.312 at 295-96; 2 NEWBERG ON CLASS ACTIONS (FOURTH) § 8:32.  "It is not the function of the settlement notice to fully inform the class of all the details of the settlement, but merely to put class members on notice of the general parameters of the settlement and to inform them of where information as to the specifics may be obtained."  *Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982), *aff'd.*, 737 F.2d 982 (11th Cir. 1984); *accord Faught*, 668 F.3d at 1239-40.

Here, the class notices proposed by the Parties satisfy all the requirements and guidelines associated with Rule 23.  Both notices:

- • define the Settlement Class and discloses that it has been certified for purposes of settlement only;

- • disclose each Settlement Class Member's right to opt-out of the Settlement and the method and deadlines for doing so;

- • describe the litigation and the allegations of the Operative Complaint;

- • summarize the key terms of the Settlement, and disclose that the notice is merely a summary of the Settlement's actual and complete terms;

- • provide information to Settlement Class Members on how they may obtain additional information and inspect additional documents relating to the Settlement and the Action generally;

- • describe the relief to be offered to Settlement Class Members under the Settlement, their options under the Settlement, and the procedures for filing appearances and objections;

- identify and explain the scope of the Release and Released Claims;

- disclose that a Service Award to the Begleys, and Attorneys' Fees and Expenses to Class Counsel, will be sought (and the maximum amounts that will be sought), but that such awards must be approved by the Court;

- provide the time and location of the Fairness Hearing, along with a description of that hearing's purpose; and

- describe the preliminary injunction to be issued by the Court on preliminary approval.

(Settlement at Exs. A & D).  The Settlement also calls for the notices to be distributed to the Settlement Class Members "beginning no later than twenty-one (21) days after entry of the Preliminary Approval Order."  (*Id.* at ¶ 5.2.1).  The Settlement establishes, and the notices disclose, that the deadline for Settlement Class Members to exclude themselves from or object to the Settlement will be thirty-five (35) days before the Fairness Hearing, which should not be held "earlier than one hundred and fifty (150) days after the date of entry of the Preliminary Approval Order."  (*Id.* at ¶ 2.1.30).  As a result, Settlement Class Members will be afforded nearly one hundred (100) days to request exclusion or object to the Settlement, a period of time wholly sufficient to give them the opportunity to evaluate and comment on the Settlement.  *Greco v. Ginn Devel. Co., LLC*, 635 F. App'x 628, 6234 (11th Cir. 2015) (collecting cases, and concluding 45 day response period adequate); *accord Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1352 (M.D. Fla. 2016) (approving notice plan affording class members 60

day response period); *Lusby v. GameStop Inc*., No. C12–03783, 2015 WL 1501095, at \*7 (N.D. Cal. Mar. 31, 2015) (same).

Moreover, separate notices are required in this Action because, while the form of relief offered to all of the Settlement Class Members is the same (*i.e.*, full remediation for any economic impact to their ACI Loans caused by any misapplication of ACI Extra Payments), the procedures for seeking and obtaining such relief necessarily differ based on an ACI Loan's status.   Through the reapplication of ACI Extra Payments under the Audit and Remediation Protocol, active and transferred loans may receive a lower unpaid principal balance, but also may end up with an earlier next payment due date.   But for paid-off, cancelled or terminated ACI Loans, there is no possibility of an earlier next payment due date because future payments are not required on such loans.   For this reason and others, the Parties have agreed that a claim-in and acceptance procedure is preferable for ACI Loans with an Active Status or Transferred Status, but not for ACI Loans with a Paid-Off Status.   As such, the notice for Settlement Class Members having ACI Loans with a Paid-Off Status does not need to include a Claim Form or a description of the Claim Form Process, while Settlement Class Members having ACI Loans with an Active Status or Transferred Status need to receive such information.   Combining such information into a single notice to all members of the Settlement Class would be confusing, inefficient and potentially

problematic.  *Faught*, 668 F.3d at 1239 ("[A]n overly detailed notice has the potential to confuse class members and impermissibly encumber their rights to benefit from the action."); *see also Hartman v. Wick*, 678 F. Supp. 312, 332 (D.D.C. 1988) (ordering separate notice to segment of settlement class "because the relief to be afforded to [them] is different from the relief available to other members of the plaintiff class.").  And although separate forms of notices are proposed by the Parties, the variations between those forms relate only to the description of the Account Adjustment relief offered by the Settlement and the Claim Process procedures—the other general provisions of the notices are identical.  *Compare* Settlement at Ex. A *with id.* at Ex. D.

At bottom, the proposed notices provide Settlement Class Members with sufficient information to make an informed and intelligent decision about the Settlement.  The proposed notices satisfy the requirements of Rule 23 and Due Process.  Accordingly, the Court should approve the form and content of the Paid-Off Notice and Active/Transfer Notice proposed by the Settlement.

### B.  The Plan for Disseminating the Notices Is Also Appropriate

The Court should also approve the Parties' plan for disseminating the notices to the members of the Settlement Class.  "The analysis for purposes of due process is on the notice plan itself, and actual receipt of notice by each individual class member is not required."  *Adams v. S. Farm Bureau Life Ins. Co.*, 417 F. Supp. 2d

1373, 1380 n. 6 (M.D. Ga. 2006) *aff'd*, 493 F.3d 1276 (11th Cir. 2007); *see also Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) ("Courts have consistently recognized that, even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice.").

Here, Class Counsel were able to identify all the loans that were enrolled in an ACI weekly or ACI bi-weekly payment plan after they were migrated from the GMACM legacy loan servicing platform to Ocwen's REALServicing platform—in other words, all of the ACI Loans that were potentially subject to ACI Extra Payment misapplications due to the Extra Payment Processing Issue.   (Class Counsel Decl. at ¶¶ 9-11).   Class Counsel also identified the property addresses, borrower names, and borrower mailing addresses associated with each of those ACI Loans.   (*Id.*).   The Parties have agreed to provide notice by U.S. First-Class Mail to each of those persons at the borrowers' mailing addresses, as identified in Ocwen's business records and as supplemented by the Settlement Administrator through the National Change of Address system and skip-tracing for all ACI Loans with a Paid-Off Status.   (Settlement at ¶ 5.2.1).   Distribution of notice by U.S. First-Class Mail is presumptively adequate.[13]   Further, Class Counsel anticipates

---

[13] *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("We think that the procedure followed by Kansas, where a fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to 'opt out,' satisfies due process."); *Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 176 (2d Cir. 2006) (distribution by first class mail is presumptively adequate). *Ciani v. Talk of the Town Restaurants, Inc.*, No. 8:14-cv-2197, 2015 WL 226013, at *6 (M.D. Fla. Jan. 16, 2015) ("The Court determines that it is appropriate to

notice directly reaching a large percentage of the Settlement Class because any ACI Extra Payment misapplications occurred only after July 2013 and delivery will be supplemented by skip-tracing and re-mailing for loans with a Paid-Off Status.

The Settlement also calls for the Settlement Administrator to create an internet website dedicated to the Settlement, and to post and make available on it various documents and information relating to the Settlement and Claim Process. (Settlement at ¶ 5.3).  A toll-free telephone number will also be available to Class Members.

Accordingly, the Court should approve not only the form and content of the proposed notices, but also the means proposed by the Parties for distributing those notices to the Settlement Class Members.

## VII.  THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

A federal district court overseeing the settlement of a nationwide class action may enjoin parallel litigation in state and federal courts under the Anti-Injunction Act, 28 U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651(a).  In fact, preliminary injunctions against competing actions by class members are commonly entered in order to (1) protect a court's jurisdiction over a proposed settlement and the class members; (2) avoid any confusion created by the pendency of parallel

---

furnish Class Notice via first class mail.").  *Accord* 7B FEDERAL PRACTICE & PROCEDURE § 1797.6 ("notice by mail to all of the identified class members . . . will suffice").

actions; and (3) prevent collateral attacks in other jurisdictions while the court considers whether the settlement should be finally approved.

Under the "necessary in aid of" exception to the Anti-Injunction Act, 28 U.S.C. § 2283, a federal court may issue an injunction to prevent parallel litigation in state courts that would impair the court's jurisdiction over and disposition of a case. *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 236 (3d Cir. 2002) ("The threat to the federal court's jurisdiction posed by parallel state actions is particularly significant where there are conditional class certification and impending settlements in federal actions."). An injunction is particularly appropriate in complex class action settlements, which "make[] special demands on the court." *Id.* at 235 (affirming issuance of an injunction where class was provisionally certified and settlement preliminarily approved). Federal courts therefore routinely issue injunctions in conjunction with class action settlements.[14]

---

[14] *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1018, 1024-25 (9th Cir. 1998) (injunction upheld where class action settlement was preliminarily approved and state court action would have excluded an entire subclass); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 880-81 (11th Cir. 1989) (class action had reached final judgment, and state court litigation would have interfered with post-judgment proceedings); *In re Baldwin-United Corp.*, 770 F.2d 328, 337-38 (2d Cir. 1985) (affirming entry of injunctions preventing absent class members from initiating parallel proceedings where the court had certified a class, settlement agreements were finalized, and only final approval remained); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334-35 (5th Cir. 1981) (same); *James v. Bellotti*, 733 F.2d 989, 994 (1st Cir. 1984) ("Nothing prevents the district court from issuing an order provisionally approving the settlement, which would support a subsequent protective injunction" under "[t]he 'necessary in aid of' language in the Anti-Injunction Act.").

The Court also has authority to enjoin competing parallel federal court actions under the All Writs Act, 28 U.S.C. § 1651(a), which permits a court to issue "all writs necessary or appropriate in aid of [its] jurisdiction[] and agreeable to the usages and principles of law." As with the "necessary in aid of" exception to the Anti-Injunction Act, the All Writs Act gives a federal district court the power to protect its jurisdiction by enjoining parallel federal actions that would interfere with the court's ability to oversee a class action settlement.[15] A court may issue an injunction as soon as the litigation reaches the settlement stage in

---

[15] *See, e.g.*, *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, MDL No. 8:11-mn-02000, 2014 WL 12621614, at *13 (D.S.C. Oct. 15, 2014) (enjoining prosecution of related actions "pending the Final Approval Hearing and the issuance of a Final Order and Judgment."); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958, 2012 WL 5055810, at *14 (D. Minn. Oct. 18, 2012) (same); *Midland Funding, LLC v. Brent*, No. 3:08 CV 1434, 2011 WL 1882507, at *2 (N.D. Ohio May 17, 2011) ("[A] federal district court overseeing [the] settlement of a nationwide class-action has ample authority under the All Writs Act and Anti–Injunction Act to enjoin parallel litigation in order to preserve its own authority to oversee settlement"); *Henson v. Ciba-Geigy Corp.*, 261 F.3d 1065, 1068 (11th Cir. 2001) ("[A] district court has the authority under the [All Writs] Act to enjoin a party to litigation before it from prosecuting an action in contravention of a settlement agreement over which the district court has retained jurisdiction."); *Holman v. Student Loan Xpress, Inc.*, No. 8:08-cv-305, 2009 WL 4015573, at *5-6 (M.D. Fla. Nov. 19, 2009) ("[A] preliminary injunction enjoining any overlapping or parallel action is necessary to preserve this court's jurisdiction to administer and enter final judgment on the proposed settlement agreement."); *Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928, 2009 WL 10263452, at *4 (N.D. Ala. Oct. 30, 2009) (preliminary injunction appropriate where "continued prosecution of [competing] action would frustrate the preliminary approval order already entered by the court"); *Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) (finding that, under All Writs Act, injunctions of related proceedings in other federal courts are appropriate where necessary for adjudication of settlement of a case: "[w]ithout enjoining related litigation, [a] court r[uns] the risk of undermining the settlement that had been negotiated and preliminarily approved"); *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 134 F.R.D. 32, 37 (E.D.N.Y. & S.D.N.Y. 1990) ("Whether viewed as an affirmative grant of power to the courts or an exception to the Anti–Injunction Act, the All-Writs Act permits courts to certify a national class action and to stay pending federal and state cases brought on behalf of class members.").

order to effectuate a final settlement.   *In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 726-77 (E.D. La. 2012) (collecting cases, and noting that courts "have been most willing to uphold an injunction … when settlement is complete or imminent in the federal court, and often after preliminary or final certification of a class"); *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 203-04 (E.D. Pa. 2014) (parallel proceeding injunction appropriate "where there are conditional class certifications and impending settlements in federal actions.").

Here, a preliminary injunction is sought to (a) enjoin all Settlement Class Members from instituting, maintaining or prosecuting any *class action* that asserts claims that would be Released Claims under the Settlement; and (b) *unless they first timely and validly submit a written request to be excluded from the Settlement Class*, enjoin the Settlement Class Members from instituting, maintaining or prosecuting any *individual action* that asserts claims that would be Released Claims under the Settlement.   Entry of this proposed preliminary injunction is warranted here because the Parties have reached a comprehensive nationwide settlement of the claims asserted on behalf of the Settlement Class—addressing globally the issues surrounding proper application of ACI Extra Payments while loans were serviced by Ocwen on REALServicing—and the Settlement has now been submitted to the Court for preliminary approval.   The Court's ability to

manage that Settlement would be impaired if competing putative class actions were allowed to proceed in parallel with this Action, raising the possibility of conflicting orders and communications from other putative class counsel in those actions, or if persons who do not opt-out of the Settlement Class are permitted to pursue parallel claims that may eventually be released here by the Settlement. An injunction will permit Settlement Class Members to review the notice materials discussing the terms of the proposed Settlement and to assess their rights and options without the distraction and confusion that would be occasioned by such competing actions. At the same time, the injunction *is narrowly tailored to permit* persons who wish to pursue their own individual claims to opt-out of the Settlement Class and this Action, and proceed with those claims.

In short, the interests of the Settlement Class Members and the jurisdiction of the Court would be impaired if, during the notice period, parallel class actions alleging virtually identical claims to those asserted in this Action were allowed to proceed, or persons who do not opt-out of the Settlement Class are permitted to individually proceed in duplicative litigation.

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, the Begleys respectfully request that the Court conditionally certify the Settlement Class for settlement purposes, appoint the Begleys as class representatives and the undersigned as Class Counsel for the

Settlement Class, preliminarily approve the Settlement, approve the proposed plan of notice to the Settlement Class, and schedule a hearing pursuant to Federal Rule of Civil Procedure 23(e) to determine whether the proposed Settlement is fair, reasonable and adequate and should be given final approval.

## LOCAL RULE 7.1(F) WORD LIMIT CERTIFICATION

On May 1, 2017, the Court granted the Begleys leave to file a brief exceeding Local Rule 7.1(F)'s briefing limitation.  (Doc. 43).  Pursuant to Local Rule 7.1(F) and the Court's Order, the Begleys hereby certify, pursuant to the word count function of the word-processing system used to prepare this motion, that this motion and its incorporated memorandum, including all headings, footnotes, and quotations, but excluding the case style, signature block, and certificate of service, contain 15,000 words.

/s/ Bryan F. Aylstock
Bryan F. Aylstock
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
Phone: (850) 202-1010
Fax: (850) 916-7449
Email: baylstock@awkolaw.com

Richard M. Golomb
Kenneth J. Grunfeld
Golomb & Honik, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102

Phone:  (215) 985-9177
Fax:  (215) 985-4169
Email:  rgolomb@golombhonik.com
         kgrunfeld@golombhonik.com

Joseph "Jay" H. Aughtman
Aughtman Law Firm, LLC
1722 Platt Place
Montgomery, AL 36117
Phone:  (334) 215-9873
Fax:  (334) 213-5663
Email:  jay@aughtmanlaw.com

Aaron C. Hemmings, Esquire
Hemmings & Stevens, P.L.L.C
5540 McNeely Drive, Suite 202
Raleigh, NC 27612
Phone:(919) 277-0161
Fax:   (919) 277-0162
Email:ahemmings@hemmingsandstevens.com

Dated:  May 12, 2017          *Attorneys for Plaintiffs and Proposed Class*


## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2017, I caused the foregoing Motion to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.


/s/ Aaron C. Hemmings
Aaron C. Hemmings